FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Oct 08 2021

KEVIN P. WEIMER , Clerk

By: /s/Sonya Lee Coggins
Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

OSCAR CAMBEROS CARRILLO

**CRIMINAL COMPLAINT**

Case Number:  1:21-MJ-0964

I, the undersigned complainant depose and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief.  On or about October 7, 2021 in Clayton County, in the Northern District of Georgia, defendant did knowingly and intentionally possess with intent to distribute a controlled substance, said act involving at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, pursuant to Title 21, United States Code, Section 841(b)(1)(A), in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Task Force Officer of the Drug Enforcement Administration and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.    Yes

*Ariana V. Jackson*
_____
Signature of Complainant
Ariana Jackson

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.  Continued on the attached sheet and made a part hereof. Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1

October 8, 2021                                          at   Atlanta, Georgia
_____                 _____
Date                                                               City and State

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE
_____
Name and Title of Judicial Officer
AUSA Irina K. Dutcher / 2021R00877/
irina.dutcher@usdoj.gov

*Linda T. Walker*
_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

ATTEST: A TRUE COPY
CERTIFIED THIS

Date: Oct 08 2021

KEVIN P. WEIMER, Clerk

By: /s/Sonya Lee Cog
Deputy Clerk

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ariana V. Jackson Task Force Officer with the Drug Enforcement Administration ("DEA"), depose and state under penalty of perjury as follows:

1. I submit this affidavit in support of an application for a criminal complaint of the following person:

> a. Oscar CAMBEROS Carrillo (hereinafter CAMBEROS); I assert that there is probable cause to believe that on or about October 7, 2021, in the Northern District of Georgia, CAMBEROS did knowingly and intentionally possess with the intent to distribute approximately ten kilograms of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a) and 841(b)(1)(A).

## AFFIANT BACKGROUND

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). I am therefore an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516 & 2510(7). Additionally, I am a Task Force Officer with the DEA assigned to Task Force Group III (TFG3) since October 2019. Additionally, I am a Deputy Sheriff with Fulton County Sheriff's Office (FCSO). Before transitioning to the DEA, I worked as a Criminal Investigator within FCSO Criminal Investigation Unit (CIU). I received approximately 11 weeks

of training in drug investigations and related legal matters at various federal and state law enforcement training facilities. Additionally, I am a certified Peace Officer in the State of Georgia and have received more than 1200 hours of POST certified training, including specialized training in drug investigations.

3. In connection with my official DEA duties, I investigate criminal violations of state and federal drug laws and related offenses, including, but not limited to, violations of O.C.G.A. §§ 16-13-30, 16-13-31, Title 21, United States Code, §§ 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, §§ 1952, 1956, and 1957.

4. During my employment with DEA, I have been active in investigations involving drugs trafficking and distribution and money laundering. I have received training on the subject of drugs trafficking and have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds. Further, I have consulted with several senior agents who have participated in many wiretap investigations that resulted in a number of arrests and seizures concerning drug trafficking and money laundering. During the course of these investigations, it was apparent that drug traffickers were using telephones in furtherance of their illegal activities. In addition, I have also analyzed telephone toll records and other records and debriefed informants regarding the use of telephones.

5. Based on my training and experience, discussions with senior agents, and based upon interviews I have conducted with defendants, witnesses, and informants, as well as others, with knowledge of the importation, distribution, and transportation of controlled substances and of the laundering and concealing of proceeds derived from drug trafficking, I am familiar with the ways in which drug traffickers conduct their business, including the ways that drug traffickers maintain records and documents relating to their drug trafficking and money laundering, and the ways that they conceal, convert, transmit, and transport their drug proceeds, including that:

   a. Drug traffickers often purchase or maintain residences, businesses, real estate, and real property to disguise or launder their illegal proceeds from drug trafficking. Records pertaining to the ownership, control, and acquisition of these properties are usually kept and maintained for an extended period of time to provide an appearance of legitimacy. Drug traffickers often place their assets in names other than their own – sometimes in the names of close family members – to avoid detection of these assets by government agencies. However, even though their assets are in other persons' names, drug traffickers own and continue to use these assets and exercise dominion and control over them.

b.  Drug traffickers often keep drugs and drug proceeds in outbuildings and structures apart from their primary residence to avert detection by law enforcement or other visitors.

c.  Drug traffickers often keep large amounts of currency immediately available in order to maintain and finance their ongoing drugs business.

d.  Drug traffickers often maintain copies of books, records, notes, ledgers, airline tickets, money orders, and other papers relative to the transportation, ordering, sale, and distribution of controlled substances.

e.  Drug traffickers occasionally "front" (provide on consignment) drugs to their clients.  Books, records, receipts, notes, ledgers, etc. (some being coded and cryptic in nature), are maintained to keep track of these arrangements, and are often kept where the drug traffickers have ready access to them, but are concealed in secure locations within, or in near proximity to, their residences, businesses, and vehicles in a way to make discovery by law enforcement authorities difficult.

f.  Persons involved in drug trafficking often conceal in and near their residences, businesses, and vehicles caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, other

4

items of value and/or proceeds of drug transactions, and evidence of financial transactions related to obtaining, transferring, secreting, and/or spending of large sums of money made from engaging in drug trafficking activities.

g.  Drug traffickers commonly keep records of codes, as well as residential addresses, e-mail addresses, telephone numbers, and/or encrypted names of their associates in the trafficking organization.

h.  Drug traffickers often utilize cellular telephones, computers, answering machines, caller identification devices, electronic address books, etc., to facilitate communication with conspirators, store telephone numbers/addresses of associates, and store other records relating to their drugs trafficking and money laundering activities.

i.  Drug traffickers often possess firearms or other weapons to protect themselves and their stashes of drugs, money, or other valuables.

j.  Drug traffickers often keep keys to safety deposit boxes, storage units, vehicles, lock boxes, or other properties that are used to facilitate drugs trafficking activities.

6. Also, based on my knowledge, training, experience, discussions with senior agents, and participation in criminal investigations, I know that:

a.  Many cellular telephones currently have advanced capabilities, including: Internet browsing, text and e-mail, photography and

5

video storage, Global Positioning System ("GPS") navigation, notes, calendars, and data file storage.

b.  Drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones.  Such cellular telephones will also carry information in a SIM (Subscriber Identity Module) card or some other type of electronic storage card that will reveal the number of the cellular telephone and other information leading to the identity of the user.

c.  I am aware, through training, experience, and discussions with senior agents, that drug traffickers use cellular telephones to communicate with each other via voice, direct connect, text message, and e-mail; store valuable data such as names, addresses, and telephone numbers of co-conspirators; obtain and store directions and maps; maintain photographs of drug trafficking associates; search the Internet; and capture audio, image, and video files. Furthermore, I know that it is common for drug traffickers to possess and use multiple cellular telephones to facilitate their unlawful conduct.  Indeed, it is my experience that drug distributors purposefully use multiple communication devices so as to not alert law enforcement to the complete scope of their own and/or their

6

organization's illicit conduct, in the event that their communications are being intercepted.  By way of example only, a drug trafficker may have one cellular telephone used to call their drug source of supply, another telephone used to call customers, and yet another to call drug distributors, in addition to a telephone for personal use.  In short, cellular telephones are vital instruments to drug traffickers.

### SOURCES OF INFORMATION

7.  I make this affidavit based upon personal knowledge derived from my participation in this investigation; information I have learned from discussions with DEA Special Agents, Task Force Officers, Intelligence Analysts, or other law enforcement officers; from recorded phone calls; surveillance, controlled purchases, and discussions with DEA Confidential Sources (CS).

8.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are stated in substance, unless otherwise indicated. Wherever in this affidavit I state a belief, that belief is based upon my knowledge, training, experience, discussions with senior agents, and the information obtained through this investigation.

9.  The facts related in this affidavit do not reflect the totality of information known to me or other agents and officers, and are merely the facts necessary to

7

establish probable cause. I do not rely upon facts not set forth herein in reaching my conclusion that a warrant should be issued, nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of the application for a warrant.

## PROBABLE CAUSE

10.  On or about September 13, 2021, DEA Chattanooga agents provided information to DEA Atlanta agents regarding a traffic stop that was conducted the same day by the Tennessee State Patrol during which approximately 10 kilograms of methamphetamine were seized from the vehicle.

11. The individual who was arrested (hereinafter "CS[1]") advised agents that the 10 kilograms were bought in Atlanta, GA from CAMBEROS.

12. On or about September 22, 2021, TFO Jonathan Keeble and I met with the CS in reference to his/her methamphetamine source of supply (SOS), CAMBEROS. The CS stated that he/she met CAMBEROS approximately 7 months ago at the car shop that CAMBEROS owns. The CS advised that CAMBEROS originally approached him/her about buying kilogram quantities of methamphetamine while the CS was smoking marijuana at the car shop.

---

[1] The CS has been working with DEA since September 2021 and is facing state charges originating from the felony drug trafficking offenses for which he/she was arrested in this investigation. The CS is working with DEA for consideration on these pending charges, although no promises have been made to the CS. The CS has a criminal history that contains felony drug charges dating back to 1999. The information the CS has provided has been independently corroborated by DEA agents, thus I believe his/her information is credible and reliable.

13. The CS advised agents that he/she has made approximately 10-12 trips from Kentucky to Atlanta, GA, to buy kilogram quantities from CAMBEROS and that he/she originally met at CAMBEROS' car shop, O&J Mechanic & Body Shop, to conduct the deals (2-3 times) before they agreed to conduct the deals at CAMBEROS' house, 6392 Stoneridge Court, Riverdale, GA 30274.

14. The CS advised agents that CAMBEROS sold each kilogram for $4,000.00 and that each time the CS picked up from CAMBEROS, he/she would bring bulk cash with him/her and pay in full.

15. The CS advised agents that when he/she met CAMBEROS at the car shop to conduct the deals, CAMBEROS came out of the shop from a side door and concealed the drugs in a brown box. Additionally, the CS advised agents that CAMBEROS behaved in the same manner when they conducted the deals at CAMBEROS' house and that CAMBEROS immediately took the money inside the shop or his house when the deal was complete.

16. The CS advised agents that he/she normally communicated with CAMBEROS via text message and that they rarely spoke on the phone except when CAMBEROS got a new telephone number. When CAMBEROS got a new telephone number, he would call the CS to let him/her know and verify that the CS answered the phone.

17. The CS confirmed the address of CAMBEROS' house and the car shop on a map in addition to providing agents with the description of three vehicles that

he/she has observed at CAMBEROS' house when he/she met there to conduct the deals. The vehicles and both the shop and house addresses were all independently corroborated during multiple surveillance operations.

18. The CS also advised agents that each time he/she met CAMBEROS at his house, he came from the side of the house carrying a box which contained individual Ziploc-type bags of methamphetamine. CAMBEROS immediately put the box in the backseat of the car and then took the money from the CS.

19. On September 13, 2021, before his/her arrest, the CS paid CAMBEROS $40,000 cash in exchange for 10 kilograms of methamphetamine and picked them up from CAMBEROS at his house.

20. After his/her arrest, the CS gave consent for Tennessee agents to search his cellphone and retrieve the current telephone number for CAMBEROS (404-914-1445, hereinafter "the 1445 number") and their text history referencing their previous meetups dating back to on or around July 28, 2021. During his/her initial debrief, the CS told agents that he/she usually would contact CAMBEROS 1-2 days in advance of traveling to Atlanta to let CAMBEROS know that he/she was ready to meet. Also, the CS advised agents that he/she would let CAMBEROS know when he/she was on the way from KY, and then usually, when he/she was 30 minutes from either the shop or the house. Agents were able to corroborate this information based on the numerous text messages found in the CS' cellphone. For example, on September 12, 2021 at approximately 12:30 p.m., the CS sent a text message to

CAMBEROS that said "Tomorrow", to which CAMBEROS responded with a thumbs up emoji. The next day, at approximately 8:57 a.m., the CS sent a text message to CAMBEROS that said "Omw" to which CAMBEROS responded with a thumbs up emoji. At approximately 1:35 p.m., the CS sent a text message that said "30" to which CAMBEROS responded "Okay"; shortly thereafter, the CS sent another text message that said "Here".

      a. Based on my training, experience, and knowledge of this investigation, I believe[2] that the CS reached out to CAMBEROS on September 12, 2021, to let him know that he/she would be traveling to Atlanta, GA the next day to pick up drugs. CAMBEROS acknowledged this text message. The next day the CS contacted CAMBEROS when he/she was on the way to Atlanta ("Omw"), when he/she was 30 minutes away from the house ("30"), and when he/she had arrived at the house ("Here").

21. On September 18, 2021, the CS sent a text message to CAMBEROS to share his/her new phone number. CAMBEROS acknowledged the CS with a text message from the 1445 number and said "Ok".

22. On October 5, 2021, DEA Atlanta members conducted surveillance on CAMBEROS. At approximately 8:50 a.m., agents observed him leave his house and

---

[2] In this affidavit, where I state, "I believe," I am basing that belief on my training, experience, and knowledge, including of this investigation.

drive directly to O&J Mechanic & Body Shop. During surveillance, agents were able to capture photos of CAMBEROS which were sent to the CS. The CS confirmed that the individual in the photo was the same individual from whom he bought 10 kilograms of methamphetamine on September 13, 2021.

23. On the same day at approximately 11:10 a.m., the CS, at the direction of agents, sent a text message to CAMBEROS that said, "Yo yo!". CAMBEROS responded by text message, using the 1445 number, and said "Yo" followed by "Ready?". The CS responded with a text message that said, "10". CAMBEROS acknowledged and said "Ok" followed "Tomorrow?" to which the CS responded with a message that said, "Getting money together now, but for sure Thursday!" CAMBEROS acknowledged with "Ok". The CS sent another text message that said, "Price go down or still 40?" and CAMBEROS responded with "40".

a. I believe that, in this conversation, the CS texted CAMBEROS to say he/she was ready to travel to Atlanta, GA to pick up 10 kilograms of methamphetamine. CAMBEROS asked the CS if he/she would be ready to pick up tomorrow, to which the CS responded to CAMBEROS that he/she would be ready on Thursday. Lastly, the CS asked CAMBEROS if the total price for the 10 kilograms had decreased since their last meeting or was it still $40,000. CAMBEROS confirmed that it would be $40,000 for 10 kilograms.

12

24. On October 7, 2021, DEA Atlanta agents conducted mobile surveillance on CAMBEROS starting at approximately 7:30 a.m.

25. At approximately 8:00 a.m., the CS sent a text to CAMBEROS that said "On my way!" and CAMBEROS replied with a thumbs up emoji. At approximately 12:25 p.m., the CS sent a text message to CAMBEROS that said "30away" and CAMBEROS replied, with a thumbs up emoji.

26. Surveillance was maintained on CAMBEROS all day until he arrived back at his house at approximately 1:30 p.m.

27. On October 7, 2021, at approximately 2:00 p.m., agents executed a federal search warrant at 6392 Stoneridge Court, Riverdale, GA 30274, CAMBEROS' house. Agents found 10 kilograms of methamphetamine inside of a brown box with the number "10" written on the top in red ink on the backseat of a Gold Hummer H2, a vehicle known to be driven by CAMBEROS, that was parked in the driveway to the house. Additionally, agents found bulk United States Currency inside of two different locked safes; one upstairs in the master bedroom and one downstairs hidden inside a utility closest behind a hot water heater. Agents also found three rifles and one handgun inside a safe in the master bedroom of the house. Another handgun was found inside a Polaris Slingshot, which was parked in the driveway of the residence.

28. Simultaneously, agents, maintaining visual surveillance of CAMBEROS' house, observed CAMBEROS exit the residence in a blue shirt and blue pants and

begin walking down the street toward his vehicles. Shortly after, CAMBEROS was confronted by agents and detained.

29. CAMBEROS was read *Miranda* warnings in Spanish, his native language, from a written form (DEA-13). CAMBEROS acknowledged that he understood his rights and agreed to speak with agents at approximately 2:09 p.m.

30. CAMBEROS advised agents that he was waiting for a customer to meet him from Kentucky to purchase the 10 kilograms of methamphetamine for $40,000.00. CAMBEROS advised agents that his friend "Beto" dropped off the drugs yesterday afternoon and placed them inside of the Hummer vehicle that was parked in the driveway of CAMBEROS' house and that CAMBEROS was supposed to contact "Beto" when the money was ready to be picked up.

## CONCLUSION

31. Based upon the aforementioned facts, I assert there is probable cause to believe that on or about October 7, 2021, in the Northern District of Georgia, CAMBEROS did knowingly and intentionally possess with the intent to distribute approximately ten kilograms of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a) and 841(b)(1)(A).

## END OF AFFIDAVIT

14